## Martin Emerich Outfitting Company v. Siegel, Cooper & Company.

### Gen. No. 13,928.

1. LANDLORD AND TENANT—*when contract does not create relation of.* *Held*, that the contract involved in this case, did not create the relation of landlord and tenant between the parties, but was a mere agreement creating a business arrangement for the benefit of both parties.

2. CONTRACTS—*when termination results from change of conditions.* *Held*, that the contract in this case, which provided for the conduct by one party of a furniture business in a part of the space occupied at the time by the other in conducting a department

store, did not contemplate its continuance in the event of the voluntary change of location by the owner of such department store or by the destruction of the space provided for by the contract and that such contract was terminated by the destruction by fire of such space without the fault or negligence of such owner.

Assumpsit. Error to the Circuit Court of Cook county; the Hon. RICHARD W. CLIFFORD, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1907. Affirmed. Opinion filed May 1, 1908.

**Statement by the Court.** This writ of error is prosecuted to reverse a judgment entered in the Circuit Court in favor of Siegel, Cooper & Company, defendant in error, defendant below (hereinafter called defendant), and against the Martin Emerich Outfitting Company, plaintiff in error and plaintiff below (hereinafter called plaintiff), on a directed verdict entered at the close of the evidence for the plaintiff.

The action was *assumpsit* to recover damages for breach of a written contract. The contract sued on is set out in the first count of the declaration, in words and figures following, to wit:

"Memorandum of agreement entered into this twelfth day of July, 1890, by and between Siegel, Cooper & Co., a corporation, party of the first part, and the Martin Emerich Outfitting Co., a corporation, party of the second part.

Whereas, said Martin Emerich Outfitting Co. is desirous of offering for sale in the premises of party of the first part in the following described space, viz., the entire third floor of the buildings known as 211, 213 and 215 State street, and the south 25 feet front of the third floor of the main building, corner State and Adams Sts., being 25x80 feet more or less, a full line of furniture, mattresses, springs and all articles strictly appertaining to such a business, and said party of the first part is willing to grant the use of said space to said party of the second part on certain terms and conditions. Now, it is hereby stipulated and agreed by and between said parties that the terms, conditions, stipulations and agreements between them for the purpose aforesaid shall be as follows:

Said party of the first part agrees to set apart for the use of said party of the second part the space hereinabove mentioned, viz., the entire third floor of the buildings known as 211, 213 and 215 State St., and a space not exceeding 25x80 feet on the third floor of the main building on the southeast corner of State and Adams Sts., Chicago, Illinois, for the sale, by the said party of the second part, of furniture, mattresses, springs, and such articles strictly appertaining to such furniture business, but not to include draperies, mirrors, pictures or picture-frames, brackets, statuary, lamps or any article now carried in our upholstery, carpet, picture, frame, crockery or house furnishing departments. And said party of the second part agrees to use said space for said purpose aforesaid; to keep said space in like clean and in good condition as other parts of the buildings at all times during the life of this agreement; to carry at all times a first-class stock of furniture, and to sell same for cash, and at as low a price as same quality will be sold by any other merchant or dealer in the same line within a radius of two miles, but said second party shall not, at any time, be compelled to sell any article below cost price; to conduct their business in a business-like manner; employ such help only and continue such in their employ as may be satisfactory to said party of the first part, which such help must comply with, conform and be subject to the rules and regulations governing the general employes of said party of the first part; discharge for cause at request of said party of the first part, any help or employee who may be obnoxious or distasteful to said party of the first part, or who may be guilty of any infraction or violation of its rules and regulations; enter into no contracts or incur any liabilities of any kind in the name of the party of the first part; not to erect or put up any signs or make any display that may be obnoxious or distasteful to said party of the first part; report at the office of the party of the first part each and every business day the gross daily sales made in said department; to keep a book or books in which all the transactions of the said furniture department shall be kept, which said books

shall always be open to inspection of said party of the first part; to bear and pay for all costs, charges and expenses of every kind, name or nature caused or created by said furniture department; to furnish a cashier who will receive all moneys for sales made in said furniture department, which such moneys are to be turned over to said party of the first part at the close of each and every business day. A settlement between the parties of the first and second part shall be made on each Tuesday of each and every week, at which time the party of the first part shall turn over to the party of the second part all moneys received from the sales of said furniture department during the preceding week, less deductions for exchanges, refunds and all expenses due from the department at the time of settlement, at which time a statement of such receipts, refunds and expenses shall be rendered; said party of the second part further agrees at his expense to furnish such wagons and horses as are needed in the delivery and handling of the goods sold in said furniture department; such wagons to be of uniform color and bear the name of Siegel, Cooper & Co. Furniture Department in like lettering as now used on all the delivery wagons of the said party of the first part; to deliver promptly and free of charge within the city limits all furniture sold in the department; to advertise the department in the daily papers under and over the name of Siegel, Cooper & Co., to the extent of not less than five thousand dollars during the first year of this agreement, and a like amount or more during each year thereafter, during the life of this agreement. All advertisements to be submitted to, and be approved by the party of the first part before being published in the newspapers, said advertising to be paid with advertising bills of said party of the first part and charged to said party of the second part, at same rate as paid by said party of the first part; to pay said Siegel, Cooper & Co. for the use of said space during the continuance of this agreement on the first day of each and every month, beginning with September 1st, 1890, the sum of $500 per month; should the gross sales in the said furniture

department after 1891 for any year beginning with September 1, 1891, exceed in amount the sum of $75,-000 during any year, then it is mutually stipulated and agreed that the party of the second part shall pay over to said party of the first part, in addition to the monthly rental hereinbefore stipulated to be paid for said year, 5 per cent. of the amount of sales in excess over the amount of seventy-five thousand dollars ($75,000) sales, which said percentage shall be paid to said party of the first part at the end of such fiscal year. Said party of the second part further agrees to purchase from the party of the first part all the furniture and all articles appertaining to the furniture department now in the premises of the said party of the first part, at such prices as may be mutually agreed upon. It is mutually stipulated and agreed that in no event or contingency shall a customer be referred to some other place of business in which said party of the second part is in any manner interested; to procure any article not on hand or in stock or suitable to said customer. In case the article sought for by the customer is not on hand in the premises, such article shall, if possible, be procured for said purchaser; but should said article be carried in stock at any other store or place of business of said party of the second part or in which he is interested in any manner, and a sale effected, said sale shall be credited to the furniture department in the premises of the party of the first part. It is furthermore stipulated and agreed that in case of death, or dissolution of the said party of the second part, said party of the first part shall have the right and power to cancel this agreement at its option on giving 30 days notice to the legal representative of the second party of its such intent to cancel said agreement. Said Siegel, Cooper & Co. hereby agree at their own cost and expense to furnish to said party of the second part in connection with said space aforesaid, the like heat, light and elevator service as is furnished by it in the regular course of business to its other departments in its business. It is furthermore mutually agreed that this agreement shall continue in force for five years from the first day of September 1890 with

the right, power and privilege on the part of the party of the first part to cancel this agreement and retake possession of said space aforesaid at any time at its option, whenever said party of the second part in the opinion of said party of the first part shall fail to fulfill, live up to, carry out, or abide by any of the agreements, stipulations and covenants hereinabove set forth and agreed by said party of the second part. But this contract shall not be cancelled nor possession of said premises taken by said party of the first part, until after written notice shall have been given to said party of the second part by said party of the first part in what manner the agreements, stipulations or covenants have been violated in order to enable said party of the second part to rectify any act of omission or commission in or connected with said furniture department business. A failure after such written notice to immediately rectify such act of omission or commission, or a wilful repetition of such or similar acts, whereby the intent and spirit of this agreement is violated, either by said party of the second part or his employees, shall authorize the cancellation of this agreement at the option of said party of the first part, without giving such notice to rectify any act of omission or commission, upon giving said party of the second part or his legal representatives 30 days notice of its intent to cancel this agreement. It is further understood and agreed that this instrument and each provision therein, shall be construed liberally and in a fair and equitable spirit, in order to further the interests of each party of this agreement, and the privileges of said second party to conduct said furniture department shall be exclusive of any other like department in said premises.

"For the faithful performance of this agreement, said parties hereto affix to duplicate copies hereof their hands and seals at Chicago, Illinois, this 12th day of July, 1890.

Siegel, Cooper & Co.

Per F. N. Cooper, V. P.

(Seal)      Martin Emerich Outfitting Co.

Per Martin Emerich, Pres.

Witness:

James Brennan."

The declaration as amended alleged the performance by the plaintiff of the contract on its part up to the time the defendant refused to allow the plaintiff to occupy the space described in the agreement. It avers the refusal of the defendant to allow plaintiff to occupy the said space, and also the refusal of defendant to allow plaintiff to occupy space in the buildings to which defendant removed and in which it carried on its business as a department store, after the destruction by fire of a portion of the premises occupied by defendant at the time of the execution of the written agreement.

To the original and amended declarations the defendant pleaded the general issue, also the Statute of Limitations of ten years to the first count and the Statute of Limitations of five years to the second count. The defendant also pleaded to each count that plaintiff entered into occupation of the space mentioned in the contract set out in said counts, and received and enjoyed the privileges, rights and benefits of said contract until August 3, 1891, on which day, before the commencement of the business hours of said day, the store and said premises of defendant, of which the space then being occupied by plaintiff was a part and parcel, were, without fault or negligence of the defendant, so utterly destroyed and consumed by fire that they were thereby rendered utterly untenantable, uninhabitable and incapable of being repaired or rendered tenantable during a portion of the period covered in said agreement, and the defendant did not at any time after said fire use or occupy said premises or any part thereof in the transaction of its said business.

The evidence produced on the trial showed the making of the contract, that the parties entered upon the performance thereof and continued to perform fully until August 3, 1891, when the premises were destroyed by fire. Defendant thereupon moved its business to other quarters on Wabash avenue and Adams

street, Chicago, but refused to let plaintiff continue the furniture department, either in the old place or the new store, claiming the contract was terminated by the fire.

Shortly after making the contract, by oral agreement of the parties, about one-half of the space described in the contract was given up, and in lieu thereof plaintiff was given and used other space in an adjoining building, connected by doors, thus increasing the space, and the fixed charge to be paid by plaintiff to defendant was increased from $500 per month, the amount named in the contract, to $615 per month.

Plaintiff introduced evidence showing it had expended large amounts of money for advertising, for the purchase of wagons and horses for the delivery of goods, the amount of stock it kept, the gross sales of the department up to the time of the fire, the cost of the goods, the expenses and the net profits.

NEWMAN, NORTHRUP, LEVINSON & BECKER and ARTHUR B. SCHAFFNER, for plaintiff in error.

AUGUSTUS BINSWANGER, for defendant in error.

MR. JUSTICE SMITH delivered the opinion of the court.

The pivotal question presented by the record and in the briefs and arguments of counsel for decision is, whether the destruction of the premises of the defendant by fire on August 3, 1891, without the fault or negligence of the defendant, the said premises being thereby rendered untenantable, uninhabitable and incapable of being repaired, and in consequence thereof the defendant did not at any time after the fire use or occupy said premises or any part thereof for the transaction of its business, terminated the contract between the parties and absolved the defendant from further obligation or liability to the plaintiff.

The contract sued on is for the use of certain space

in the building named therein to conduct a furniture business, nominally in the name of the defendant, in connection with the business of the defendant then carried on, for a period of five years from September 1, 1890. It contains certain regulations for the use of the space, the kind of stock which the plaintiff was to carry, the employment of help, the reporting of sales, and other details which are not important to be now considered, except in so far as they throw light upon the general purpose and character of the contract. The defendant agreed to set apart the space described in the contract for the use of the plaintiff, to make weekly settlements for the moneys received from sales of furniture, after deducting the expenses of the department, and to furnish heat and elevator service. For the space and service the plaintiff agreed to pay a fixed sum and in addition thereto five per cent. of the excess of its sales over seventy-five thousand dollars per annum.

While the contract has some of the elements of a lease and much of its phraseology is of the character usually found in contracts of lease, we are of the opinion that it does not create the relation of landlord and tenant between the parties; but, as said in Dickinson v. Hart, 142 N. Y. 183: "The agreement created a business arrangement for the benefit of both parties."

The contract contemplates a particular space in the building or buildings named and no other space in any other building or buildings. It contains no provisions for the termination of the agreement in case of the destruction of the building by fire or other agency, or for any other cause except the failure of the plaintiff to comply with its terms. There is no language in the contract which relates to or contemplates the furnishing of any other space in another building. No intent or purpose can be gathered from the writing itself that it was to apply to any space in any other building than that named. On the other hand it bound the defend-

ant to furnish the space and carry on business in the building named during the period specified; and it bound the plaintiff to conduct its business in the space named for the specified period. It is not contemplated even that the defendant might remove its business to any other place, for business reasons. The right so to do is not reserved in the contract, nor would plaintiff, in our opinion, be bound to follow defendant to any other place which it might select and determine to occupy, and carry on the department of the plaintiff there in connection with the business of the defendant. To hold that the plaintiff was so obligated by the agreement in question would amount to writing into the contract as made substantial and important provisions which were not only not expressed in the contract as made, but were not in the minds of the parties when the contract was framed and executed.

In placing this construction on the contract we are not unmindful of the following provision of the agreement: "This instrument and each provision therein, shall be construed liberally and in a fair and equitable spirit, in order to further the interests of each party of this agreement." This provision, we understand, applies to the agreement and each provision therein, but does not apply to anything outside of the four corners of the instrument.

It is contended on behalf of plaintiff that the agreement was for the purpose of carrying on a particular kind of business in the defendant's establishment, as a branch or department business, and in no wise dependent upon the particular locality in which the defendant carried on that business. And upon the removal of that business, whether by the voluntary act of the defendant, or by the destruction of the building in which the business was carried on, the plaintiff had the right under the contract to conduct the furniture department of the defendant's business, and could have been held liable upon the agreement for failure so to do.

We find no such broad and general purpose expressed in the contract. The language used in the instrument is so simple and clear that it cannot be said to be in the least contradictory, obscure or ambiguous. Our attention is not called to any such provisions, sentence or clauses in the instrument. Nor is our attention called to any particular word, phrase or expression in the contract from which any such broad intent or purpose is manifested or even suggested. Putting ourselves as far as possible in the place of the parties when their minds met upon the terms of this agreement, and from a consideration of the circumstances surrounding them, and the objects which they had in view, and reading the terms of the agreement in the light of all these circumstances and conditions, we cannot discover that the parties intended to provide for the conduct of the furniture department of defendant's business by the plaintiff upon any or every voluntary removal thereof to any place which might be selected by defendant for the prosecution of its business; nor can we discover from the instrument that the contingency of the destruction of the defendant's place of business, as shown by the evidence, was intended to be provided for in any manner. Reasons readily appear for making provision in such a contract for such contingencies. On the other hand, cogent reasons suggest themselves for not attempting to extend the contract so as to cover the contingency which actually occurred, or that of voluntary removal from the premises described. Differences as to the time of removal and place to which such removal should be made, the allotment of space, the service which should be rendered under unknown and special conditions, might give rise to endless controversies between the parties. The difficulties in the way of framing just and equitable provisions for the unknown contingencies and situations which might thus arise would prevent prudent men from committing themselves to such uncertainties in a large busi-

ness enterprise. Doubtless, the parties to the agreement, if they at any time during the preliminary negotiations which led up to the agreement thought of the desirability of providing for these unexpected contingencies within the brief period covered by the contract, never brought it up for mutual consideration for the purpose of embodying them in the contract; or, if they were so considered, the difficulties of providing therefor, in a contract which was to be binding on both parties alike, led to the entire abandonment of the idea, for the contract when considered in detail and as an entirety, is significantly silent upon that subject, containing no word or expression indicating any such intent or purpose.

In view of these considerations, it is apparent, we think, that there is no warrant in the contract for the construction sought to be placed thereon by counsel for plaintiff. In our opinion, the contract is based upon the contract of the business in the particular space in the building described therein, and in no other place; and that the tender by the defendant of space and service in the building in which it did business after the fire would not be a substantial performance of the contract on its part in law. Whether the contract could be substantially performed or not, in that way, was not, in our opinion, a question of fact which should have been submitted to the jury.

The next question for consideration then is, what effect, if any, the destruction of the building shown by plaintiff's evidence had upon the contract.

In 2 Chitty on Contracts (11 Am. Ed.) 1076, the author says: "But in contracts from the nature of which it is apparent that the parties contracted on the basis of continual existence of a given person or thing, a condition is implied that if the performance becomes impossible from the perishing of the person or thing, that shall excuse such performance."

The learned author cites Taylor v. Caldwell, 3 Best & Smith, 826, in support of the doctrine stated by

Martin Emerich O. Co. v. Siegel, Cooper & Co.

him.  In that case a contract was involved for the giving of concerts in a certain music hall which was destroyed by fire accidentally.  It was held that both parties were thereby excused from the performance of the contract, because the general rule requiring absolute performance "is only applicable where the contract is positive and absolute and not subject to any condition, express or implied."  In that case it was further held that:  "Where from the nature of the contract it appears that the parties must from the beginning have known that it could not be fulfilled unless, when the time for the fulfillment arrived, some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done, then, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without the default of the contractor."

This doctrine has been enunciated and approved in Walker v. Tucker, 70 Ill. 527; Siegel, Cooper & Co. v. Eaton & Prince Co., 165 *id.* 550; Huyett & Smith v. Chicago Edison Co., 167 *id.* 233; and Smith v. Preston, 170 *id.* 179.  It is sustained by numerous authorities in other jurisdictions, some of which are, Wells v. Calnan, 107 Mass. 514; Dexter v. Norton, 47 N. Y. 62; and Shear v. Wright, 60 Mich. 159.

In our opinion, the destruction of the building rendered a substantial performance of the contract impossible, and excused its further performance.

It thus appears that the evidence produced by the plaintiff with all the inferences proper to be drawn therefrom did not fairly tend to prove the cause of action set out in the declaration, and the court, therefore, properly directed a verdict.

The judgment is affirmed.

*Affirmed.*